# EXHIBIT "B"

# CONDENSED TRANSCRIPT AND WORD INDEX

The Oral/Video Deposition of

# ANTHONY MOREHOUSE

**Date:** 8/9/2011

**Case:** Robert James Henry v. City of Taylor Terry Dechiara Anthony Morehouse Joseph Branson

Gracie O'Rourke Court Reporters
Phone:210-479-6161
Fax:210-479-6162
Email:gracieorourke@sbcglobal.net
Internet: www.godepos.com

IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF TEXAS
AUSTIN DIVISION

ROBERT JAMES HENRY )
)
Plaintiff )
)
VS. ) No. 1:10-CV-00693-LY
)
CITY OF TAYLOR )
TERRY DECHIARA )
ANTHONY MOREHOUSE )
JOSEPH BRANSON )
)
Defendants )

************************************
ORAL AND VIDEOTAPED DEPOSITION OF

ANTHONY MOREHOUSE

AUGUST 9, 2011
************************************

THE ORAL AND VIDEOTAPED DEPOSITION of ANTHONY MOREHOUSE, produced as a witness at the instance of the Plaintiff and duly sworn, was taken in the above-styled and numbered cause on the 9th day of August 2011, from 1:33 p.m. to 2:40 p.m., before CAROL DE LEON, Certified Shorthand Reporter in and for the State of Texas, reported by stenographic and computer-aided transcription, in the law offices of Wright & Greenhill, 221 West 6th Street, Suite 1800, Austin, Texas 78701, pursuant to the Federal Rules of Civil Procedure and the provisions stated on the record or attached hereto.

STIPULATIONS

It is further stipulated and agreed by and between counsel for the respective parties hereto that the original of the deposition of ANTHONY MOREHOUSE shall be sent to him, ANTHONY MOREHOUSE, by and through his attorney of record, MIKE THOMPSON, JR., LAW OFFICES OF WRIGHT & GREENHILL, P.C., 221 WEST 6TH STREET, SUITE 1800, AUSTIN, TEXAS 78701, for the purpose of obtaining the signature of the witness thereon before any notary public.



APPEARANCES

FOR THE PLAINTIFF:
DONNA HALL KEITH
LAW OFFICES OF DONNA HALL KEITH
605 WEST OLTORF STREET
AUSTIN, TEXAS 78704
(512) 743-6064
donna-keith@sbcglobal.net

FOR THE DEFENDANTS:
MIKE THOMPSON, JR.
LAW OFFICES OF WRIGHT & GREENHILL, P.C.
221 WEST 6TH STREET, SUITE 1800
AUSTIN, TEXAS 78701
(512) 476-4600
mthompson@w-g.com

ALSO PRESENT:
REVEREND ROBERT J. HENRY

JEREMY GARRETT
The Videographer
CAROL DE LEON
Certified Shorthand Reporter



INDEX


| | PAGE |
|---|---|
| Stipulations | 2 |
| Appearances | 3 |
| Index | 4 |
| ANTHONY MOREHOUSE Examination by MS. KEITH | 5 |
| Witness Signature Page | 59 |
| Reporter's Jurat | 61 |


EXHIBIT INDEX


| NO. | DESCRIPTION | PAGE |
|---|---|---|
| 1 | Incident and Crime Report | 42 |
| 2 | Use of Force Policy | 45 |
| 3 | Use of Force Report | 34 |




(Proceedings began at 1:33 p.m.)

ANTHONY MOREHOUSE,

having been first duly sworn, testified as follows:

EXAMINATION

BY MS. KEITH:
Q. Would you state your name for the record.
A. Anthony Morehouse.
Q. And is it Detective Morehouse?
A. Yes, ma'am.
Q. Okay. My name is Donna Keith. I'm counsel for the Reverend R. J. Henry, who's the plaintiff in this case. Do you see him sitting next to me?
A. Yes, ma'am.
Q. Okay. What's your current occupation, Detective Morehouse?
A. Detective.
Q. And who are you employed with?
A. Taylor Police Department.
Q. Do you have a certain unit that you work with?
A. I -- narcotics, but now I'm back to helping with regular investigations. We're -- we're detective shy right now, so --
Q. Okay. And how long have you been in your current position?
A. As a detective in the whole?

Page 6

Q. Yes.
A. Since approximately August 2009.
Q. And prior to that, what was your position?
A. Patrol officer.
Q. Where did you work before joining the Taylor Police Department?
A. Texas Tech Police Department.
Q. How long were you there?
A. Approximately a year and a half, two years. I don't know for sure.
Q. What was your reason -- reason for leaving?
A. My wife and I, we had our second kid. And she said, Let's get back home to where our family is.
Q. Excellent reason.
A. Yes, ma'am.
Q. Can you tell me about your training or education for your current position.
A. As a detective or as a police officer?
Q. Both.
A. Okay. As a -- we'll start off with that as a police officer. Graduated Lubbock Police Academy, which has more training than your regular basic academy. And then since then I have taken over 2,400 hours worth of training hours and about to hold my intermediate license.

Page 7

Q. And when did you graduate from the Lubbock Police Academy?
A. I believe it was either February 3rd, 2006 or February 6th, 2006.
Q. And what -- you said you're about to get your intermediary license?
A. Yes, ma'am.
Q. What is that?
A. It's just a -- when officers were encouraged to take as many classes as we can, constantly learn more. And so some agencies pay you extra money when you get your license. You have a basic peace officer license, intermediate, advanced, and master's.
Q. I see. Do you have any other training?
A. As far as?
Q. As far as that might be relevant to your current position.
A. I worked EMS for a while, if that's -- and -- and volunteer firefighter with --
Q. Who did you work with as far as the EMS goes?
A. Scott & White.
Q. In what location?
A. As far as -- well, Scott & White, Temple was the main headquarters but we had different branch stations that we would also work at.

Page 8

Q. So you were in Temple?
A. Temple, Rogers, Cameron, Rockdale --
Q. Oh, I see.
A. -- wherever we got assigned, if they needed a truck there.
Q. Okay. And as far as the volunteer fire department?
A. Yes, ma'am.
Q. Where was that?
A. Granger Fire Department and also Little River Academy, back when I was younger.
Q. Granger is where?
A. It's about 11 miles just north of Taylor.
Q. Okay. And so have you been --
MR. THOMPSON: Did you say "Ranger" or "Granger"?
THE WITNESS: Granger, G-R-A-N-G-E-R.
MR. THOMPSON: Okay.
Q. (BY MS. KEITH) So have you have been kind of this Central Texas, North Central Texas area for a while?
A. My whole life, basically, except for the short while I was in Lubbock.
Q. Okay. What kind of training have you had regarding use of force?

Page 9

A. I've had the basic use of force we learned in the academy. I've also had intermediate use of force, which are TCLEOSE training.
Outside of that, I've also handled SWAT type situations doing my current role in Narcotics. So I have quite a bit extensive training there.
Q. So do you have special training for the SWAT aspect of it?
A. There is.
Q. Okay. And can you describe that?
A. As far as -- it's mainly just entry training. When you come to that, there's not -- the type of -- how do you say? Use of force tactics that we use is defensive tactics. Krav Maga is the one I've learned.
SWAT -- the extra SWAT training is your -- embellishing your police presence, I guess, would be a way of saying it, for entry.
Q. Do you have any training for interacting with individuals who have a mental health diagnosis?
A. Yes, ma'am.
Q. Can you describe that?
A. Yeah. We have CIT training, which is mandated training by the State. We're required to take that training every two years. And I am current and always have been current on that.

Page 10

Outside of that, I've got to work closely with our Williamson County CIT team and --
Q. How often would you say you work with the CIT team?
A. When I was on patrol, it was more than current situation or current position. There were times we'd call them out twice a month or more than that.
And then I have relatives who are mental challenges as well so --
Q. Which relatives, if you don't mind saying.
A. I -- I have a 21-year-old cousin now who has Down's Syndrome and wasn't expected to live past seven but she's doing good.
Q. Great. Have you -- let me back up.
Have you had any complaint of misconduct filed against you?
A. As far as?
Q. As far as your role as a police officer or a police detective.
A. To answer this question fairly would be to say that as a police officer you always have people who don't like you, who don't like the way you make traffic stops. So I've had that.
There's never been anything substantiated, nothing ever founded. Anyone can always

Page 11

file a complaint but nothing's ever been substantiated or found to be true --
Q. Can --
A. -- if that's the way of saying it.
Q. Can you say the nature of the complaints that have been filed against you?
A. I've had people just tell me that I was rude to them on a traffic stop. A lot of times people get upset when they get citations for offenses that they don't feel are worthy of receiving a citation, whether it be seat belt or how fast they were going during a school zone.
The most current complaint that I've had, say, would be just a couple weeks ago where I had individuals who didn't like the way I filed for a warrant to arrest somebody. They thought I was going too fast on it but everything was fine.
Q. Okay. Have you ever been before the Civil Service Commission?
A. No, ma'am.
Q. Okay. Have you ever been subjected to any corrective action by your department?
A. No, ma'am.
Q. Well, let's talk about the arrest and the facts leading up to the arrest of Reverend Henry on

Page 12

September 22nd, 2008.
Did you have opportunity to review any reports regarding the incident?
A. Yes, ma'am.
Q. Okay. Can you tell me what time you arrived on the scene?
A. Honestly, no.
Q. Okay. Do you recall who was there when you arrived?
A. Let me ask you a question on this: This -- this was actually a -- almost two incidents in the same day. So which one -- how do you -- how do you want to --
Q. Great. I'm glad you asked me that. I wasn't sure if you were present for both.
A. Yes, ma'am.
Q. Okay. Well, let's start with the one that occurred first.
A. Okay.
Q. So who was there when you arrived?
A. When I arrived there, it was Sergeant Dechiara, Corporal Branson, Officer Cook.
Q. Officer Cook?
A. Yes, ma'am.
Q. Okay. And what's Officer Cook's first name?

Page 13

A. Aaron.
Q. Aaron Cook?
A. Yes, ma'am.
Q. Okay. And so when you arrived, what was the scene like?
A. When I arrived, I was just informed -- can I back up to give a little more --
Q. Sure.
A. Okay. I -- I -- I heard a radio dispatch over to the Reverend Henry's house, saying that he had contacted 911, our dispatch, saying that there were people there wearing stars on their shirts, trying to take him away. And so he called us for a disturbance.
So the officers got there, I was coming from the other side of town. When I got there, I was informed that it was the constables who were there trying to serve warrants. And so --
Q. Was this your first interaction with Reverend Henry?
A. Yes, ma'am.
Q. Okay.
A. Other than seeing him walk down the streets or something like that. Yes, ma'am.
Q. Okay. Had you ever discussed Reverend Henry with anyone else prior to this day?

Page 14

A. Yes, ma'am. Yeah.
Q. How so?
A. I was informed that Reverend Henry -- this is by -- by Sergeant Dechiara that -- been informed that Reverend Henry, some people are scared of him because of his stature, his size. He's a good-sized man. And that there are times that he does go off of his medications, and he starts screaming and yelling and stuff like that, but not to - not to get scared of him or anything. And that, you know, he's still pretty calm. It's just how you deal with him.
Q. And how did that conversation come up?
A. Because we saw him -- I was riding with Sergeant Dechiara one day when we were -- when gas was high, and so we were riding together. And Reverend Henry was wearing an all-matching attire, which was -- and after even -- after being told, I've learned this to be fairly true, that when wearing matching pants, shirts, shoes, and hat and everything, it's usually a sign that he's been off of his meds, and he starts showing mental issues. I mean, just -- and that's been true.
And I -- I saw him that day, and he was swinging his cane, walking up and down the sidewalk. And that's when Sergeant Dechiara told me, Don't worry

Page 15

about him. So --
Q. When you saw him, what was your impression?
A. I'd just say, Oh, look. That guy over there, he's just swinging his cane around. I mean, didn't really think anything of it.
Q. But you did you comment to --
A. Yeah --
Q. -- Sergeant --
A. -- yeah. It was -- it was obvious -- I mean, you -- you could tell right away that it was possibly a -- a mental situation, but there wasn't anyone in the area that he was worrying -- you know, bothering or anything at all. So it wasn't anything that needed us.
Q. Okay. So going back to the day of the incident.
A. Okay.
Q. You said you had a radio dispatch?
A. Yes, ma'am.
Q. And --
A. I wasn't directly dispatched but --
Q. You heard it?
A. Yes, ma'am.
Q. Okay. And then what happened after that?
A. I arrived over there. And Sergeant Dechiara said -- told the constables, You-all just let us try and

Page 16

see if we can take him into custody, you know. You-all let us deal with him because there -- there have been previous incidences where -- in -- in Reverend Henry's case or Mr. Henry's case, some officers can be very intimidated by him.
And since Mr. Dechiara -- or Sergeant Dechiara has dealt with him in the past and knows him very well, he's usually able to bring the -- handle the situation much better than other officers because they don't know him.
And so he told the constables, Look, we'll take care of this. And I know there was -- has been previous incidences between Sergeant Dechiara -- or between Mr. Henry and DPS where Sergeant Dechiara has stepped in to help Mr. Henry out.
So anyways, so that was the situation. He told the constables to leave so that we could take care of him. And Mr. Henry was coming outside and stepping on his porch and yelling and stuff. And then he would go right back inside of his house.
I was told, Go hide around the fence on the north side. And so I was standing on the north side of the fence -- or, yeah, north of the fence, which is also north of his porch. And I was told to see if he comes outside, to try to get between him and the door

Page 17

and then we would probably be able to take him into custody without any issues.
Now in his yard there is a large barbecue pit and other debris. And so when he did come out, and I did try and get between him and the door, he beat me right back inside because I couldn't get around the debris. We did this twice before realizing that wasn't going to work.
After that, I then went on the porch, knocked on the door, tried to get him to come out, and he turned his music way up loud. And I heard stomping inside and what appeared to be preaching because I heard religious comments being made. And so --
Q. So did you leave at that point?
A. Yeah. After -- after that, when he turned his music up and everything, Sergeant Dechiara told us just to, you know, back off. And then I was going to -- my understanding is that Sergeant Dechiara called Mr. Henry's brother, who agreed to come and visit with Mr. Henry and get him taken down to the jail.
Q. And did his brother come?
A. His brother did show up but after we -- after I had already left. From my -- my understanding, he showed up, and I don't know if he had made contact with Mr. Henry at the time or just Sergeant Dechiara.

Page 18

Q. Okay. So at the point when you left, who was left on the scene?
A. I can't say for sure because we were parked in many different locations. So I'd hate to speculate who was still there.
When I left, I left because I ended up having to go take another call.
Q. Okay. Did you write a report --
A. No, ma'am.
Q. -- regarding --
MR. THOMPSON: Let her finish her question.
THE WITNESS: Yeah, and I'm sorry.
Q. (BY MS. KEITH) Okay. Now you mentioned interactions with Reverend Henry and DPS?
A. Yes, ma'am.
Q. Where did you get that information from?
A. Just through the -- I guess the -- I'd say Sergeant Dechiara, or was it Corporal Branson? Other people have -- it's kind of a -- a thing in the PD that everyone knows that Sergeant Dechiara likes Reverend Henry and respects Reverend Henry and that he's the one -- he has trained the majority of our officers in dealing with Mr. Henry.
I've seen Sergeant Dechiara give

Page 19

Mr. Henry hugs when he's in a mental -- having a medical issue, to calm him down. I've seen Sergeant Dechiara back up to Mr. Henry when he's swinging his arms and yelling, actually go back-to-back with him to show other officers, Look, he's not going to hurt you. As long as you're not aggressive towards him, he -- he can be fine. So --
Q. Okay. And so let's move on to the second part --
A. Okay.
Q. -- of that day. Do you recall what time you arrived?
A. No, ma'am.
Q. Okay. Did you hear a dispatch on this occasion as well?
A. Yes, ma'am.
Q. And what did it say?
A. I was -- I was in the process of taking another call whenever this came out. But I heard her say, Terroristic threat and disturbance going on at Terry's Body Shop, which is the property and the building just south of Mr. Henry's residence and his property.
Q. Okay.
A. So when I got there, I pulled in through -- on

Page 20

the east side of Terry's Body Shop where they have a yard where they keep their cars and stuff. And I came in through the shop that direction.
When I came through the shop, I saw Sergeant Dechiara ahead of me, directing another individual who had a gun, a rifle, to put it up in the car. I say a rifle, it could have been a shotgun. I don't really recall which one. It was a long barrel firearm -- directing him to go put the gun up.
So I, then, direct my attention towards the individual with the weapon. And I go to him and I say, What are you doing with this, you know. What's going on here? Because I don't know what's happening right now. I'm evaluating the scene.
And he says, Well, I'm not going to get hurt. I'm going to go home today. I'm not -- you know, You're not going to threaten me. And I said, What's going on? And he said, That crazy man over there. So -- so Sergeant says, Put your -- put your gun up. We'll take care of the situation.
And so he put it up, he went back inside the shop and then I came out. And that was Sergeant Dechiara, and Corporal Branson was arriving at that time, too.
Q. Okay. Who-all was present during that

Page 21

exchange?
A. Between?
Q. The person with the weapon --
A. And myself?
Q. Yes. And who else was present?
A. Other employees in the -- that are working there at the time.
Q. Just employees?
A. Yes, ma'am.
Q. All right. And so what did you do after that?
A. After he secured his weapon, and I felt assured that he wasn't going to be pulling it out again, I -- I exited the shop on the west side and out onto Edmond Street and met up with Sergeant Dechiara.
Q. And did you have a discussion at that point?
A. Yes, ma'am.
Q. And what was that?
A. Sergeant Dechiara told me what apparently -- because while I was visiting with the individual with the gun, he, apparently, was visiting with what the threat -- what had happened.
And he told me that he was informed that Mr. Henry had threatened to burn down the -- Terry's Body Shop because they felt that he -- that they were the ones who called the constables out there on the

first place, on the original call.
Q. Okay. And so what steps did you take after that?
A. So we -- I remember we -- we stood around for a little bit; Corporal Branson showed up. And then -- I hate to say, if I remember exactly, if Sergeant Dechiara went up to the house by himself and knocked on the door, I -- or if Mr. Henry just stepped outside. I -- I can't say for sure. I don't remember that part.
Q. Okay.
A. But ultimately after whatever happens there, Sergeant Dechiara brings his vehicle around onto Edmond Street and is parked just west of the -- Terry's Body Shop, which is south of Mr. Henry's house.
Q. Now on Edmond Street, is that in view of Reverend Henry's front door?
A. From where the vehicle was parked?
Q. Yes.
A. No, ma'am.
Q. Okay. Go ahead.
A. Because the way the -- there's -- it's set up is there's like, I'd say, Hackberry trees or some type of overgrown trees that are -- that grow up along the fence line there and that were -- would -- could -- could block the view.



Q. Okay. So the sergeant brought his car around. Then what happened?
A. We were visiting about, you know, We've got to get Mr. Henry into custody. We have warrants on him. We've got to get him into custody because we've got these people next door who are pulling out weapons. And so for the safety of everybody, you know, we need to get him in custody that day.
Q. Well, you knew you had warrants earlier in the day, right?
A. Yes, ma'am.
Q. But he wasn't taken into custody?
A. Right.
Q. Do you know why?
A. Because Mr. -- or Sergeant Dechiara visited with Mr. Henry's brother, who agreed to get him to come down to the PD and turn himself in, which did not happen.
Q. And where did you get that information?
A. From Sergeant Dechiara.
Q. Okay. And so do you know if there was a particular time he was supposed to turn himself in?
A. I can't say for sure. I wasn't involved in the conversation. When I hear that I would assume, Come over here and get him and take him down.



Q. Okay. And so at that time when you were visiting with Sergeant Dechiara, did he give you the impression that he expected Reverend Henry to have turned himself in already?
A. What he said -- after the incident he said, Look, we've got to take care of this now. And so it would just be -- I mean, I wouldn't say there was really an impression there because I guess I had already assumed in my mind that the deal was for him to come over, pick him up and take him down to the PD.
I didn't ask him specifically when was he supposed to turn himself in, so I can't say.
Q. Okay. And so Sergeant Dechiara had come to the conclusion that the Reverend needed to be taken in?
A. Yes, ma'am.
Q. Okay. Did he give you any explanation for that?
A. I don't know that a explanation really needed to be said to me. I mean, I've been doing law enforcement since 2006. When you have a individual who has had many previous occasions -- and I've read the reports on these with Terry's Body Shop. And then you have people in Terry's Body Shop pulling out weapons to protect themselves, Mr. -- Mr. Henry, whether he's -- would know what his actions would do on someone else or



would be able to understand that his actions were intimidating other people to the point that it's now putting him in a danger for himself, I think was -- that was my biggest fear was that they would do something to him and -- because I -- I had never dealt with him.
Most of our CIT situations, people can say a lot of things, and they can appear very scary but not actually follow through with, you know, whatever their threats are. But to these people who have no idea about CIT situations, they just get scared.
And I mean, I didn't need Sergeant Dechiara to tell me why it was important that we got him into custody. I've handled many CITs in the past to know this was important.
Q. Did it occurred to you to arrest the individuals that had the weapons and that -- seemed to me from your statement earlier, they seemed as though they might take action against Reverend Henry and they had weapons. Did it occur to you to take them into custody?
A. There's no charge for them. There was no charge to take them into custody.
Q. Okay. That's hard for me to understand.
A. Okay.
Q. Can you explain it a little bit better?

Page 26

A. Well, in -- in Texas you're allowed -- you're allowed to carry firearms.
Q. Okay.
A. You know, we're not talking about a pistol. We're talking about a -- a rifle or a shotgun, and you're allowed to carry that with you. And you're allowed to defend yourself; you're -- if that's what you need.
If -- if the shop owners now say -- you know, if they allow -- Yeah, man, bring your gun inside, you know, protect yourself. It's okay. I -- I can't just say, Look, you pulled out your gun, and you walked it into your house, and your intention was to protect yourself. Now you're going to jail. It's -- there's no charge for that.
Q. But if he goes outside of his house.
A. Now if he takes the weapon over to Reverend Henry's house to confront him and say, You're not going to do this, then we'd be in a totally different circumstance. But that wasn't the case at all.
Q. Okay.
A. He brought it inside his place of business.
Q. So you were overall concerned that violence might occur?
A. Yes, ma'am.

Page 27

Q. Okay. And so after the decision was made to take Reverend Henry into custody, what happened next?
A. We saw we were going to have to sit out and wait for this time and, you know, see if we can get Reverend Henry into custody because we surely couldn't leave at this point.
So basically Sergeant Dechiara, knowing Reverend Henry could -- almost was able to -- or Mr. Henry was able to say -- well, to protect his movements, and it was correct, that we would -- because Reverend -- Mr. Henry was coming outside, yelling and stuff and then he'd go back inside of his house.
So Sergeant Dechiara was sitting on the hood of his car, facing the north, and I was facing Sergeant Dechiara, facing the south, and Corporal Branson was facing the west. So Sergeant Dechiara said, Just ignore him. We'll just sit around and talk. Just ignore him, and he'll get mad and he'll keep coming further out, and he'll keep coming further out. And we'll wait until he gets far enough from his house that we can take him into custody. So that was the plan.
So we're sitting back; I'm talking with Sergeant Dechiara. And he tells me, Okay, he's coming out. So I'm just -- I'm not turned around. I've got my back to him. And then he tells me to -- he says, All

Page 28

right, now. So I turn around, and I begin to run.
As I begin to run, I look up, and I see that Mr. Henry is standing in the middle of the road facing the north with his shorts down around his ankles and his thumbs in his underwear on the side. And he's bent over like he's about to pull his underwear down.
Q. Okay. Let me interrupt real quick.
A. Yes, ma'am.
Q. So facing towards his house?
A. Facing the north.
Q. I'm not --
A. Okay. His house, the front door faces the west.
Q. Okay.
A. Edmond Street runs north and south.
Q. Okay. So which street was he facing?
A. He was on Edmond, facing north. So he would be facing Third Street?
Q. Okay. Thank you. Okay, so go ahead. He has his hands --
A. He has thumbs inside of his underwear.
Q. Okay.
A. And -- like he's about to pull his underwear down. And he's bent forward with his shorts around his ankles.

Page 29

As I approach, I get about -- I'd say estimate of 10 feet to him when he looks over -- unknown why, whether he heard me coming or just was looking -- he heard me -- or he looked over, saw me, began to move forward. And at that time, I made contact with him and we -- I took him to the ground.
Q. You were the only one taking him to the ground?
A. Yes, ma'am.
Q. And where were the other officers?
A. Trying to catch up.
Q. Okay. So you were given the order to go and secure him?
A. Yes, ma'am.
Q. And -- I'm sorry. Who was the other officer there?
A. There was Sergeant Dechiara and Corporal Branson.
Q. So Sergeant Dechiara gave the order --
A. Yes, ma'am.
Q. -- directly to you?
A. Well, that was -- the plan was -- because -- I don't know if you've met Sergeant Dechiara yet or not or Corporal Branson. You'll soon see that I'm much more in shape, fit, and much faster.

Page 30

And so it was known that if there was going to be any kind of trying to catch him before he gets to his door, I was going to be the only one to do that.
Q. Okay. So you made contact with him. How did you make contact?
A. The way I'm trained -- I already decided in my mind that I was going to need to do a takedown maneuver of him because standing toe-to-toe, my size versus his size wasn't going to be a good position for me. And I determined that was going to be my best way.
So the way I was trained in taking someone to the ground, if -- if it's a running situation, of course, many different circumstances to everything -- the way I did it was I came upon him, and I wrapped up around him at first. And then right as -- before he hit the ground, I bring my arms out. That way my arms don't get between him and the ground, so I can still get away and maneuver.
Q. And that's exactly how you it?
A. Yes, ma'am.
Q. Okay. And so did the Reverend fall and hit the ground?
A. Yes, ma'am.
Q. Okay. And what did you do immediately after

Page 31

that impact?
A. As soon as -- as soon as we hit the ground, I come up, and I'm still in -- on my knees, I guess you would say -- and I'm at his legs, just to make sure he's, you know, down, and I'm able move just in case he starts to get up.
At that point, Corporal Branson comes up on my right side and takes his right arm and begins to try and secure him.
Q. Okay. So during this time that -- I'm starting from the point where the three of you are sitting on the patrol car, facing different directions.
A. Yes, ma'am.
Q. Starting from that point, were any verbal commands given to the Reverend?
A. Starting from after we -- after I began to run towards him or --
Q. No. Starting from the point where you're sitting on the patrol car, if I understood you correctly --
A. Uh-huh.
Q. -- you're all facing different directions, ignoring him --
A. Uh-huh.
Q. -- and he's coming out further and further

Page 32

each time. Were any verbal commands given at that time?
A. Prior to me running and after -- when we're sitting down? No, ma'am.
Q. Okay. Now from the time that you started running --
A. Uh-huh.
Q. -- were any verbal commands given?
A. I did not give any verbal commands because my intention was to sneak up on him, because I didn't want him to beat me back to the house.
I remember hearing -- I can't say who, but I remember hearing someone saying, "Police." I don't remember which one.
Q. Okay. All right. And so what happened after you got him off the ground?
A. Would you -- there's a little more there before we get off the ground.
Q. Oh, okay.
A. I mean, it's --
Q. I'm sorry. Go ahead.
A. We -- Corporal Branson came up on the right side, took his right arm. Sergeant Dechiara then comes over on the left side. And I don't -- I'm not involved in the handcuffing or grabbing of the arms to handcuff him. Sergeant Dechiara's doing that and Corporal

Page 33

Branson is. And he's resisting during this time. He's got one arm underneath him, and he's pulling away from us. He wouldn't allow us to cuff him. And then Sergeant Dechiara got his arm -- his left arm out, and Branson was able to secure him.
Then the way of getting him off the ground, which I believe is important in this case, the way that we were trained to bring people up off the ground was, they're handcuffed -- because obviously they can't help very much -- is set them up in a -- on their bottom with their knees in front of them. And then you bring them up to the -- you can let them push against you and you stand them up.
I was on his left side, holding his left arm. Corporal Branson was on his right side, holding his right arm. And we lifted him up.
Q. Okay. And after that?
A. Then I let go. And Corporal Branson escorted him to, I believe, Corporal Branson's car. It wasn't my vehicle, but I believe Corporal Branson's car.
Q. Did the Reverend say anything at the time that the impact was made or immediately thereafter?
A. The only thing I remember him talking about was his sunglasses. They got broken. And I picked his sunglasses up and showed it to him, and he was real

Page 34

upset about that.
Q. Okay. Do you have any idea how long you were outside, waiting for your chance to sneak up and secure the Reverend?
A. On the -- are you talking about while we're sitting on the car --
Q. Yes.
A. -- at that point? I'd say less than five, 10 minutes. It wasn't very long.
Q. I'm going to show you what's marked as Exhibit 3. And can you just tell me what that is?
MR. THOMPSON: I've got yours.
A. Yeah. It's a --
MR. THOMPSON: Make sure you look at it.
A. It's a Use of Force Report.
Q. (BY MS. KEITH) Have you seen this before?
A. Yes, ma'am.
Q. Who is the author of this report?
A. It would appear to be Sergeant Dechiara.
Q. Did you make a Use of Force Report?
A. No, ma'am.
Q. Can you tell me why you didn't?
A. Because my supervisor did one.
Q. Okay. Is that standard procedure?
A. Yes, ma'am.

Page 35

Q. Okay. It would seem to me that the person that actually used the force would be the one writing the report. But that's not the case?
A. Your question -- and this is --
Q. Let me try to clarify my question.
You're -- you're saying to me that the standard procedure is for the supervisor to make the Use of Force Report. And I'm asking, wouldn't it make more sense if the person that actually used the force made the report?
A. I -- I can see that -- I can see it both -- both directions. From an officer and -- from an officer point of view, if I were to use force on somebody, and say I were to write my own Use of Force Report, then it could look as if, though, I maybe wrote it however I wanted it to justify my own actions, whereas if you had an outside person who's -- who did -- who observed your actions say, Well, this is what happened, and this is why he did it.
So whenever you have a supervisor there, especially two supervisors on duty, from an officer's standpoint it would make more sense for the supervisor to do it. But I can see it your direction -- your direction as well.
Q. Now if you look at the Use of Force Report, at

Page 36

the very bottom above the date and the signature, the last two lines seem to indicate that there was more than one officer sprinting and tackling Reverend Henry.
Do you agree with my interpretation of this report?
A. I'm trying to -- it's possible that he wanted to put down that he was able to run 40 yards. You'll see shortly after. There's no -- I mean, I -- I hate to be rude towards any of the other officers, but there's no way they could keep up with me in -- in a sprint. And I -- I sprinted the distance.
When you see Sergeant Dechiara, you'll understand he would not have been able to keep up with me and Corporal Branson there, too. So I was the only one who made impact with him at all or -- so --
Q. Okay. So you're clear about that?
A. Yes, ma'am.
Q. But the report does seem to indicate that there was more than one officer --
A. Yeah.
Q. -- tackling the Reverend.
A. Yeah.
MR. THOMPSON: Objection, form. You can answer the question.
THE WITNESS: I'm sorry.

Page 37

MR. THOMPSON: You can answer the question.
THE WITNESS: Okay.
MR. THOMPSON: Just for the record, I have to make an objection.
A. I mean, I -- I can -- I can sit here and read that, what you're saying. But then, of course, I have my own thoughts on why he would put that there, too. So -- and just like I said --
Q. (BY MS. KEITH) The report also indicates a takedown, slash, grappling?
A. Yes, ma'am.
Q. Is that what you described to me earlier?
A. Yes, ma'am.
Q. So grappling is the same as a takedown?
A. Grappling would be more of a hands-on. If you and I were standing toe-to-toe, and I needed to take you down, that would be a grappling maneuver.
Q. Is there any special technique you can use to try to prevent injury when you're using that takedown procedure?
A. I'm sure you can -- there's -- anything's always possible. But the way in which that we were trained, and you have to understand that I'm going to go home at the end of the day as uninjured in the best way

Page 38

that I can -- that I came to work.
And the way that we were trained, and we did many, many maneuvers to do it, or we had to go through it many times, is when we're running in the situation like this, you run, you wrap up so that you have -- so that you're able to make contact.
And -- and then right before you hit the ground, and you bring your arms out so you don't get cut up, so you don't get mangled up, and so that whenever -- once you're -- once you're on the ground, you're not trapped, either. You're able to still move your hands, if needed.
And so unfortunately, any time -- any time we as law enforcement have to use any type of force when, you know, we've got -- we've got to be able to weigh what's the minimal of force that we can do for the situation.
I mean, unfortunately, there's always times that, you know, someone gets hurt out of that.
Q. So that technique that you described, after wrapping your arms around the person, you open them wide. And that means the weight of your body is going to fall on to the person that you're trying to take down?
A. Which would happen whether my arms are there

Page 39

or not.
MR. THOMPSON: Just answer his -- the question.
THE WITNESS: Okay.
Q. (BY MS. KEITH) Is that correct?
A. Yes.
Q. Okay. And so is -- were you not -- in all of your training, were you taught any techniques to try to prevent injury of the person you're trying to take down?
A. No.
Can we take a break for a second and get some more coffee?
Q. Sure.
A. Okay.
MS. KEITH: Go off the record, please.
(Recess from 2:13 to 2:16 p.m.)
Q. (BY MS. KEITH) Detective Morehouse, do you believe that Reverend Henry could have out-sprinted you back to his door? Talking about the second scenario when you say you sprinted the 40 yards? Was it 40 yards?
A. It -- I estimate it to be a little bit more than that. But it's --
Q. Okay. Do you believe that Reverend Henry could have beat you back to the door?

Page 40

A. With or without his shorts up?
Fair question. I'm sorry.
Q. Well, that's a good question.
So when he looked up and saw you, his shorts were still up?
A. No, ma'am.
Q. They were down.
A. Yes, ma'am.
Q. Okay. So yes, with his shorts down.
A. No.
Q. Okay. So at that point, obviously, you were running full speed?
A. Yes, ma'am.
Q. You could have made the decision not to take him down and just beat him back to the door?
A. I don't believe that would have been in my best -- in officer's safety-wise, I don't think that would have been the best call to make.
Q. And why do you say that?
A. Because if I would have -- if I show up on Mr. Henry toe-to-toe and I try and confront him, and he's -- he's agitated at this point, then, you know, one good hit from him and -- and the jewelry he wears, and I'm knocked out on the ground.
My best thing is that -- and the call

Page 41

that I made is that, best thing for me and him, to protect us both, is that we're both on the ground, kind of level the playing field.
Q. Okay. And what I'm suggesting is that if you're at the door, Sergeant Dechiara is present and able to -- as you have testified -- work with Reverend Henry in getting him to cooperate, why wouldn't that be a viable option?
A. Because now we're putting ourselves in a position where we -- we lose the element of surprise. We are now -- at one point someone's going to have to go toe-to-toe with him to take him into custody, you know, get up close and personal with him. And he has a history with resisting arrest, with fleeing. I mean, that's what the warrants were for initially.
What they were taking him into custody for was resisting arrest, assault, bodily injury, fleeing or evading. And so it's -- unfortunately it's one of those things you have to make a judgment call in a split second. You have to take a totality of the circumstances all at once.
Q. So you believe that under the circumstances of that day, someone was going to have to go toe-to-toe with the Reverend?
A. No. Because the way I did it, we didn't have

Page 42

to do that.
Q. But if you had chose another option, you believe you would have had to do that.
A. Good possibility. Yes, ma'am.
Q. That's seems to me to contradict somewhat your earlier explanation and description of how Sergeant Dechiara is able to work with Reverend Henry --
A. Uh-huh.
Q. -- and how he has instructed and trained the officers --
A. Uh-huh.
Q. -- to do the same.
A. Uh-huh.
Q. So can you kind of -- is there any way you can explain that discrepancy?
A. Yeah. I -- I can -- I can see what you're saying there. But at the same time, obviously, the things that Sergeant Dechiara had tried doing in trying to reason with him to get him out -- we tried reasoning with him to get him out -- led it to, he's not in as normal of a reasonable mind as he is on other circumstances.
Every -- unfortunately every circumstance is different.
Q. I'm going to show you what's marked as Exhibit

Page 43

1. Can you tell me what that is, please.
A. Seems to be -- the first page is a Supplement Report. The second page would appear to be a narrative. The third page would be your Suspect Information Page. And the fourth page is your cover sheet, normally the first page.
Q. Okay, sorry. I have those out of order.
A. That's fine.
Q. And does this exhibit appear to be a report that would come after an incident?
A. Yes, ma'am.
Q. Okay. And is it describing the incident we're talking about today?
A. It looks familiar. But let me read it just to make sure we're talking the same one here.
Q. Sure.
A. Yes, ma'am.
Q. And who's the author of this report?
A. The supplement or the narrative?
Q. I was looking at the supplement.
A. The supplement would be Sergeant Dechiara.
Q. And have you drafted any part of this report -- report?
A. No, ma'am.
Q. If you could look at the first paragraph of

Page 44

the Supplementary Report, which is the first page of the exhibit. So you just look over that for a second. I'm going to ask you a question.
A. Just the first paragraph?
Q. Yes.
A. Okay. Yes, ma'am.
Q. Do you see any mention in that first paragraph of yourself going to Reverend Henry's door and trying to get him to come out?
A. In that first paragraph?
Q. Yes.
A. No, ma'am.
Q. I'm sorry. What was your answer?
A. I said, no, ma'am.
Q. And is the first paragraph describing the first event that took place that day?
A. It would appear so. Yes, ma'am.
Q. So this is describing the first time that you were on the scene that day?
A. Yes, ma'am.
Q. And does it seem to accurately reflect your account of the events?
A. No, ma'am.
Q. How so?
A. It's missing, you know, a lot of the

Page 45

information of what happened that -- during that time.
Q. And what is it that's missing?
A. The part where we try to get between him and his front door on two occasions. And then going to the door and trying to get him to come out.
Q. And Sergeant Dechiara was present at the time when you were attempting to get him to come out?
A. Yes, ma'am.
Q. Okay. Okay. I'm going to show you Exhibit 2. And if you could tell me what this is.
A. The Taylor Police Department Use of Force Policy.
Q. Okay. Have you seen this document before?
A. Yes, ma'am.
Q. Okay. Let's -- let's just take time and go through this a little bit.
Looking at the first page -- oh, first let me ask you: Look through and see is -- if this is a complete Use of Force Policy attached in this exhibit.
A. I'd hate to answer 100 percent that it's definitely the same one because without having one to compare it to, I can't say for sure.
Q. Sure. You will note that at the very bottom it says, COT. And it has page numbers.
A. Okay.

Page 46

Q. That means that the attorney, your attorney, provided this to me.
A. Okay.
Q. If that gives you any reassurance.
But it looks like it's the policy?
A. Yes, ma'am.
Q. Okay. Looking at the first page and the second paragraph, does that paragraph state that the use of force should be no greater than the least amount of force necessary?
A. It says that -- yes.
Q. And is that your understanding of the policy?
A. Yes, ma'am.
Q. Has that been your training?
A. Yes, ma'am.
Q. In this case, when you use the takedown tactic, do you feel as though you used the least amount of force that was necessary under the circumstances?
A. Yes, ma'am.
Q. Again, I think you might have said this, but why do you feel that's the case?
A. Due to the circumstances where we've already attempted to take him in -- into custody, get between him and his door, due to the size difference, which is a huge determining factor, I determined that that was the

Page 47

minimal amount of force that I needed to protect myself and him in effecting an arrest.
Q. Now looking further down the page, Section .02B, could you read that part for me, please.
A. "Officer shall always endeavor to minimize the pain and injury that may possibly result from the type and degree of force they use."
Q. Do you feel like you complied with that part of the policy when you used the takedown on Reverend Henry?
A. Yes, ma'am.
Q. Looking at page 2? What -- I'm looking at Section .03. And it's number 1 that says, "Officer Presence."
A. Uh-huh.
Q. What does that mean to you?
A. This is our use of force continuum, which is pretty much accepted nationwide. So the officer presence is where we usually gain 90 percent compliance in dealing with citizens. By us being there in uniform, being there, looking like police, we're usually able to gain compliance. People don't resist or --
Q. And then number two says, "Verbal Direction Command"?
A. Uh-huh.

Page 48

Q. Can you explain that?
A. In this instance that would be where we're knocking the door, telling Reverend Henry, Come out. You need to -- you know, We have warrants for your arrest. You need to comply.
When he's running back into the house, we're telling him, "Stop, stop. You got warrants." You know, that being a -- verbal commands.
Q. Okay. And in this case, did that happen?
A. Yes, ma'am.
Q. So I don't -- I don't remember you saying that earlier. So can you explain when you were giving him commands for him to stop --
A. Yeah.
Q. -- and he was running into the house, and tell us when that occurred.
A. That was on the -- the first occurrence, whenever I was trying to get between him and the door. And it was -- when he was -- when I was trying to make it around, and he was cutting right back inside.
Stop, stop. Don't. And then he got back in. And he -- he actually left his door partially open. And Sergeant Dechiara yelled at me, Don't go in, don't go in. So --
Q. Okay. And so you were the one yelling, Stop,

Page 49

stop, don't?
A. Yes, ma'am.
Q. Okay. And once he got in, did you yell anything at that point?
A. Not the first -- the first time.
Q. Okay. And what did you do the first time after he got back in his door?
A. Went back to where I was back to where I was; see if he'd come out again; see if he'd come out a little further; if I can get between him and the door the next time.
Q. Did anyone ever say, We have a warrant for your arrest, come out?
A. Yes, ma'am.
Q. Okay. When did that happen?
A. Well, first that was originally when the constables were there, when he originally called 911, that was what the constables were telling him prior to me getting there.
My understanding, of course, I wasn't on scene at the time. Plus I started to drag on the door and try to get him to come out and tell him he had warrants.
Q. Did anyone with the Taylor Police Department do that?

Page 50

A. Sergeant Dechiara is what I -- yes, sir.
Q. So when did that happen?
A. That's what I was saying. I believe that happened prior to me get there. My understanding was that he had done that.
Q. Okay, I'm sorry. I didn't understand that. Okay.
And so the second part of the day, was there any attempt at that -- that part of the incident to tell him, Stop, or, Come out, you have warrants?
A. Again, I can't say I remember earlier when I told you after the second event and I came out, that I met up with Sergeant Dechiara. I'm not able to say what he did, you know, because I was dealing with the other individual.
I don't know if he had made that attempt or not. I -- I hate to say for sure.
Q. Okay. So you didn't hear anything of that nature?
A. Right. Originally.
Q. Looking on to page 3 of the policy. Number 3 says, "Empty Hand Control."
A. Uh-huh.
Q. Can you explain what that is?
A. That's basically not using weapons or punches

Page 51

or things like that; using wrist locks, pain compliance, things like that.
Q. Okay. And then number 4 says, "Chemical Weapons." What does that mean?
A. Our OC spray, Mace, referred to as that.
Q. And do you carry Mace?
A. At that time I probably wasn't even carrying it. I do not use that stuff.
Q. And if you -- if -- if that was an option available to you, do you think it would have been appropriate?
A. No, ma'am.
Q. Why so?
A. I'm not a fan of Mace. It gets on everybody, can cause people to have tremendous problems breathing and stuff. If someone has medical situations it can -- it can cause a lot of issues.
And it -- personally, it can -- it causes me to almost not be able to breathe so I don't use it.
Q. Now looking at this list of seven points, I think you said this is the force continuum.
A. Yes, ma'am.
Q. Which category would the takedown fall in?
A. It'd fall under, probably, number five.
Q. Heavy hand techniques?

Page 52

A. I would -- I would use that. Either -- it -- it would be almost between -- I mean, you have your number 3C, which is escort techniques. But I wouldn't like to -- that's more of the grappling like we spoke about earlier. I would -- I would call it under that one.
This one I'd probably put under number 5.
Q. Okay. Okay. Looking at page 4, Section .04, do you see the list that's headed, "Levels of Resistance"?
A. Yes, ma'am.
Q. Which of those, if any, would you say that Reverend Henry was displaying on that day?
A. I'd go with active aggression.
Q. Okay. And --
A. Or active resistance. I mean, it'd be between those.
Q. Okay. And so can you give me an example of active aggression?
A. Well, he was throwing things out in his -- onto the roadway, things, like, from his refrigerator or throwing large items and just chunking them out there. So he was showing he was aggressive already. And then --
Q. Okay. Let's stop right there.

Page 53

A. Okay.
Q. At what time was he doing that?
A. That was the second event that we're there.
Q. And so is this the time when you're sitting on -- sitting on the patrol car?
A. Yes, ma'am.
Q. And so he was throwing things from his front door --
A. Well, let me --
Q. -- all the way to the street?
A. Well, let me -- let me let me clarify real quick. Prior to us getting there, there were things on the roadway that were thrown from his residence. So I can't say for sure that I saw him doing that. I didn't see him throwing it out there.
But -- and that's coming from the report of what we heard from the Terry's Body Shop people.
Q. Oh, okay.
A. So, yeah.
Q. I see. So when you got there, there's things on the road --
A. Right.
Q. -- and the employees at Terry's said that Reverend Henry --
A. Right.

Page 54

Q. -- threw then out there?
A. Right.
Q. Did they say he was throwing them at someone?
A. They said he was just throwing it out there in the yard -- or in the roadway.
And then to continue your question there, it was also with him going to Terry's Body Shop and reportedly swinging the stick or his cane around there and showing aggression that he was going to burn their place down.
You know, he's obviously very agitated at this point. So --
Q. And did you see that part?
A. No, ma'am.
Q. Okay. And is there an example of the active resistance?
A. That would be him running into his house after we keep telling him to stop and trying to intervene.
Q. So let me make sure I understand.
On the second incident, was Reverend Henry running back into the house?
A. He was coming outside and going right back in. We weren't -- at that point I wasn't trying to get between him, so we weren't running back and forth that time.

Page 55

Q. And were you at that time giving him any commands to stop?
A. I wasn't.
Q. Was anyone that was there?
A. I don't remember.
Q. Okay. And so is it classified as active resistance if you're not showing in some way that you want him to come?
A. I still say so. I mean, we have the earlier incident, and I'm okay in looking at viewing it the same way.
Q. So based on the fact of what happened earlier that morning, you think his conduct that afternoon was active resistance?
A. Let me ask you -- or have you rephrase that question. In order to say "morning and afternoon," it makes it appear that these are two totally separate instances, when in fact they weren't very far apart.
It was basically me leaving and turning around and coming right back. So --
Q. Okay. When I looked at the report -- and I think you have it in front of you -- the first incident appeared to take place a little before 10:00?
A. That's when we originally got called out there.

Page 56

Q. Okay. And so do you have any idea what time you originally left?
A. Right here, I would say no.
Q. Okay.
A. Or, I mean, as far as estimating -- I could estimate for you. But having the information in front of me, I couldn't say.
Q. Okay. And what time was the second call? What time, according to the report, was the second call?
A. 11:53.
Q. Okay. And so we can't really tell from the report the amount of time that passed between the time you left the first time and came back the second time?
A. Right.
Q. Okay. And so you are willing to estimate that time for us?
A. I would -- I would say that the time that we left the first time, I would say we're probably looking at about 10:45 to 11:15.
Q. Okay. And that's the time you left?
A. Yes, ma'am.
Q. Okay. And from your understanding at that time, there was some resolution made?
A. Yes, ma'am.
Q. Okay. Is there any other example of the

Page 57

active resistance?
A. At this time that I'm sitting here, nervous in my seat, can think of, no.
Q. Do your patrol cars have video capability?
A. Yes, ma'am.
Q. They do now.
Did -- did they in '08 at the time of this incident?
A. Yes, ma'am.
Q. Was there any video made?
A. No, ma'am.
Q. That's all the questions I have.
I pass the witness.
MR. THOMPSON: We'll reserve our questions until the time of trial. Thank you.
(Proceedings ended at 2:40 p.m.)

Page 58

CHANGES AND SIGNATURE

WITNESS NAME: ANTHONY MOREHOUSE

DATE OF DEPOSITION: AUGUST 9, 2011

PAGE LINE CHANGE REASON FOR CHANGE

________________________________________

Page 59

SIGNATURE

I, ANTHONY MOREHOUSE, have read the foregoing deposition and hereby affix my signature that same is true and correct, except as noted above.

________________________

ANTHONY MOREHOUSE

THE STATE OF __________)

COUNTY OF ____________)

Before me, ______________________, on this day personally appeared ANTHONY MOREHOUSE, known to me (or proved to me under oath or through______________) to be the person whose name is subscribed to the foregoing instrument and acknowledged to me that they executed the same for the purposes and consideration therein expressed.

Given under my hand and seal of office this________day of _________________ 2011.

________________________

NOTARY PUBLIC IN AND FOR
THE STATE OF _________

Page 60

IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF TEXAS
AUSTIN DIVISION

ROBERT JAMES HENRY )
)
Plaintiff )
)
VS. ) No. 1:10-CV-00693-LY
)
CITY OF TAYLOR )
TERRY DECHIARA )
ANTHONY MOREHOUSE )
JOSEPH BRANSON )
)
Defendants )

********************************

REPORTER'S CERTIFICATION
DEPOSITION OF ANTHONY MOREHOUSE
AUGUST 9, 2011

********************************

I, CAROL DE LEON, Certified Shorthand Reporter in and for the State of Texas, hereby certify to the following:

That the witness, ANTHONY MOREHOUSE, was duly sworn by the officer and that the transcript of the oral deposition is a true record of the testimony given by the witness;

That the deposition transcript was submitted on August ____ 2011 to the witness for examination, signature and return to me by September ____ 2011;

That the amount of time used by each party at the deposition is as follows:

MS. KEITH - (1 hours 4 minutes)
MR. THOMPSON - (0 hours 1 minutes)

Page 61

That pursuant to information given to the deposition officer at the time said testimony was taken, the following includes counsel for all parties of record:

Donna Hall Keith, Attorney for Plaintiff
Mike Thompson, Jr., Attorney for Defendants,
City of Taylor, Terry Dechiara, Anthony Morehouse, Joseph Branson

I further certify that I am neither counsel for, related to, nor employed by any of the parties or attorneys in the action in which this proceeding was taken, and further that I am not financially or otherwise interested in the outcome of the action.

Further certification requirements pursuant to Rule 30 of the FRCP will be certified to after they have occurred.

Certified to by me this______day of _____________ 2011.

Carol De Leon, Texas CSR 7716
Expiration Date: 12/31/12
Firm Registration No. 426
Gracie O'Rourke Court Reporters
19015 La Verita
San Antonio, Texas 78258
Phone: (210) 479-6161
Fax: (210) 479-6162

FURTHER CERTIFICATION UNDER RULE 30 FRCP

The original deposition was/was not returned to the deposition officer on_______________________;

If returned, the attached Changes and Signature page contains any changes and the reasons therefor;

If returned, the original deposition was delivered to Donna Hall Keith, the Custodial Attorney;

That $___________ is the deposition officer's charges to the Plaintiff for preparing the original deposition transcript and any copies of exhibits;

That the deposition was delivered in accordance with Rule 30, and that a copy of this certificate was served on all parties shown herein on and filed with the Clerk.

Certified to by me this _______day of ________________, 2011.

________________________________

Carol De Leon, Texas CSR 7716
Expiration Date: 12/31/12
Firm Registration No. 426
Gracie O'Rourke Court Reporters
19015 La Verita
San Antonio, Texas 78258
Phone: (210) 479-6161
Fax: (210) 479-6162

**A**
**Aaron** 13:1,2
**able** 16:8 17:1 25:1 27:8,9 31:5 33:5 36:7 36:13 38:6,11 38:15 41:6 42:7 47:21 50:13 51:19
**above-styled** 1:17
**academy** 6:21 6:22 7:2 8:11 9:2
**accepted** 47:18
**account** 44:22
**accurately** 44:21
**acknowledged** 59:15
**action** 11:22 25:18 61:9,11
**actions** 24:25 25:1 35:16,18
**active** 52:14,16 52:19 54:15 55:6,14 57:1
**advanced** 7:13
**affix** 59:3
**afternoon** 55:13 55:16
**agencies** 7:11
**aggression** 52:14,19 54:9
**aggressive** 19:6 52:23
**agitated** 40:22 54:11
**ago** 11:14
**agree** 36:4
**agreed** 2:2 17:19 23:16
**ahead** 20:5 22:20 28:19 32:20
**allow** 26:10 33:3
**allowed** 26:1,2 26:6,7
**all-matching** 14:16
**amount** 46:9,17 47:1 56:12 60:22
**ankles** 28:4,25
**answer** 10:20 36:24 37:1 39:2 44:13 45:20
**Anthony** 1:7,11 1:15 2:4,5 4:5 5:2,7 58:2 59:2,6,12 60:7 60:12,16 61:5
**Antonio** 61:20 62:20
**anything's** 37:22
**anyways** 16:16
**apart** 55:18
**apparently** 21:18,20
**appear** 25:7 34:19 43:3,9 44:17 55:17
**Appearances** 3:1 4:3
**appeared** 17:12 55:23 59:12
**approach** 29:1
**appropriate** 51:11
**approximately** 6:2,9
**area** 8:20 15:12
**arm** 31:8 32:22 33:2,4,4,15,16
**arms** 19:3 30:17 30:18 32:24 38:8,21,25
**arrest** 11:16,24 11:25 25:15 41:14,17 47:2 48:5 49:13
**arrived** 12:5,9 12:20,21 13:4 13:6 15:24 19:12
**arriving** 20:23
**asked** 12:14
**asking** 35:8
**aspect** 9:8
**assault** 41:17
**assigned** 8:4
**assume** 23:24
**assumed** 24:9
**assured** 21:12
**attached** 1:24 45:19 62:4
**attempt** 50:9,16
**attempted** 46:23
**attempting** 45:7
**attention** 20:10
**attire** 14:16
**attorney** 2:5 46:1,1 61:4,5 62:7
**attorneys** 61:8
**August** 1:12,17 6:2 58:3 60:12 60:20
**Austin** 1:2,22 2:7 3:4,8 60:2
**author** 34:18 43:18
**available** 51:10

**B**
**back** 5:20 6:13 8:11 10:14 13:7 15:14 16:20 17:6,17 19:3 20:21 27:12,22,25 32:10 39:19 39:25 40:15 48:6,20,21 49:7,8,8 54:21 54:22,24 55:20 56:13
**back-to-back** 19:4
**barbecue** 17:3
**barrel** 20:8
**based** 55:12
**basic** 6:22 7:12 9:1
**basically** 8:22 27:7 50:25 55:19
**beat** 17:5 32:10 39:25 40:15
**began** 5:1 29:4 31:16
**begins** 31:8
**believe** 7:3 33:7 33:19,20 39:18,24 40:16 41:22 42:3 50:3
**belt** 11:11
**bent** 28:6,24
**best** 30:11 37:25 40:17 40:18,25 41:1
**better** 16:9 25:25
**biggest** 25:4
**bit** 9:6 22:5 25:25 39:22 45:16
**block** 22:25
**bodily** 41:17
**body** 19:21 20:1 21:24 22:13 24:22,23 38:22 53:17 54:7
**bothering** 15:12
**bottom** 33:11 36:1 45:23
**branch** 7:24
**Branson** 1:7 12:22 18:19 20:23 22:5 27:16 29:18 29:24 31:7 32:21 33:1,5 33:15,18 36:14 60:7 61:6
**Branson's** 33:19,20
**break** 39:11
**breathe** 51:19
**breathing** 51:15
**bring** 16:8 26:10 30:17 33:8,12 38:8
**brings** 22:12
**broken** 33:24
**brother** 17:19 17:21,22 23:16
**brought** 23:1 26:22
**building** 19:22
**burn** 21:23 54:9
**business** 26:22

**C**
**call** 10:7 18:7 19:19 22:1 40:18,25 41:19 52:5 56:8,9
**called** 13:13 17:18 21:25 49:17 55:24
**calm** 14:10 19:2
**Cameron** 8:2
**cane** 14:24 15:4 54:8
**capability** 57:4

car 20:7 23:1 27:14 31:12 31:19 33:19 33:20 34:6 53:5
care 16:12,18 20:20 24:6
Carol 1:18 3:13 60:14 61:18 62:18
carry 26:2,6 51:6
carrying 51:7
cars 20:2 57:4
case 5:12 16:4,4 26:20 31:5 33:7 35:3 46:16,21 48:9
catch 29:11 30:2
category 51:23
cause 1:17 51:15,17
causes 51:18
Central 8:20,20
certain 5:19
certificate 62:12
certification 60:11 61:12 62:1
certified 1:18 3:13 60:14 61:13,14 62:14
certify 60:15 61:7
challenges 10:9
chance 34:3
CHANGE 58:4 58:4
changes 58:1 62:4,5
charge 25:21,22 26:15
charges 62:9
Chemical 51:3
chose 42:2
chunking 52:22
circumstance 26:20 42:23
circumstances 30:14 41:21 41:22 42:22 46:18,22
CIT 9:22 10:2,3 25:6,10
citation 11:10
citations 11:9
citizens 47:20
CITs 25:13
City 1:6 60:6 61:5
Civil 1:23 11:18
clarify 35:5 53:11
classes 7:10
classified 55:6
clear 36:16
Clerk 62:13
close 41:13
closely 10:1
coffee 39:12
come 9:12 14:12 17:4,10,19,21 23:16,24 24:9 24:13 31:3 43:10 44:9 45:5,7 48:3 49:9,9,13,22 50:10 55:8
comes 16:25 31:7 32:22
coming 13:14 16:18 27:11 27:18,19,23 29:3 31:25 53:16 54:22 55:20
Command 47:24
commands 31:15 32:1,7,8 48:8,13 55:2
comment 15:6
comments 17:13
Commission 11:19
compare 45:22
complaint 10:15 11:1,13
complaints 11:5
complete 45:19
compliance 47:19,22 51:1
complied 47:8
comply 48:5
computer-aid... 1:20
concerned 26:23
conclusion 24:14
conduct 55:13
confront 26:18 40:21
consideration 59:16
constables 13:16 15:25 16:11,17 21:25 49:17 49:18
constantly 7:10
contact 17:24 29:5 30:5,6 38:6
contacted 13:11
contains 62:5
continue 54:6
continuum 47:17 51:21
contradict 42:5
Control 50:22
conversation 14:12 23:24
Cook 12:22,23 13:2
Cook's 12:25
cooperate 41:7
copies 62:10
copy 62:12
Corporal 12:22 18:19 20:23 22:5 27:15 29:17,24 31:7 32:21,25 33:15,18,19 33:20 36:14
correct 27:10 39:5 59:4
corrective 11:22
correctly 31:20
COT 45:24
counsel 2:3 5:10 61:3,7
County 10:2 59:10
couple 11:14
course 30:14 37:7 49:20
Court 1:1 60:1 61:19 62:19
cousin 10:11
cover 43:5
crazy 20:18
Crime 4:12
CSR 61:18 62:18
cuff 33:3
current 5:14,24 6:17 7:17 9:5 9:24,25 10:5,6 11:13
Custodial 62:7
custody 16:1 17:2 23:4,5,8 23:12 25:13 25:20,22 27:2 27:5,21 41:12 41:16 46:23
cut 38:8
cutting 48:20

D

danger 25:3
date 36:1 58:3 61:18 62:18
day 1:17 12:12 13:25 14:14 14:23 15:14 19:11 23:8,10 37:25 41:23 44:16,19 50:8 52:13 59:11 59:18 61:14 62:14
De 1:18 3:13 60:14 61:18 62:18
deal 14:11 16:2 24:9
dealing 18:24 47:20 50:14
dealt 16:7 25:5
debris 17:4,7
Dechiara 1:6 12:22 14:4,14 14:25 15:24 16:6,7,13,14 17:16,18,25 18:19,21,25 19:2 20:5,23 21:14,18 22:6 22:12 23:15 23:20 24:2,13 25:12 27:7,13 27:15,16,23 29:17,19,23 32:22 33:4 34:19 36:12 41:5 42:7,18 43:21 45:6

48:23 50:1,13 60:6 61:5
**Dechiara's** 32:25
**decided** 30:7
**decision** 27:1 40:14
**defend** 26:7
**Defendants** 1:8 3:6 60:8 61:5
**defensive** 9:14
**definitely** 45:21
**degree** 47:7
**delivered** 62:6 62:11
**department** 5:18 6:6,7 8:7 8:10 11:22 45:11 49:24
**deposition** 1:10 1:14 2:4 58:3 59:3 60:12,17 60:19,23 61:1 62:2,3,6,8,9 62:11
**describe** 9:10 9:21
**described** 37:13 38:20
**describing** 43:12 44:15 44:18
**description** 4:11 42:6
**detective** 5:8,15 5:16,21,25 6:18 10:19 39:17
**determined** 30:11 46:25
**determining** 46:25
**diagnosis** 9:19
**difference** 46:24
**different** 7:24 18:4 26:19 30:14 31:12 31:22 42:24
**direct** 20:10
**directing** 20:5,9
**direction** 20:3 35:23,24 47:23
**directions** 31:12 31:22 35:12
**directly** 15:20 29:21
**discrepancy** 42:15
**discussed** 13:24
**discussion** 21:15
**dispatch** 13:9 13:11 15:17 19:14
**dispatched** 15:20
**displaying** 52:13
**distance** 36:11
**DISTRICT** 1:1 1:1 60:1,1
**disturbance** 13:13 19:20
**DIVISION** 1:2 60:2
**document** 45:13
**doing** 9:5 10:13 20:12 24:19 32:25 42:18 53:2,14
**Donna** 3:2,3 5:10 61:4 62:7
**donna-keith...** 3:5
**door** 16:25 17:5 17:10 22:7,16 23:6 28:12 30:3 39:19,25 40:15 41:5 44:8 45:4,5 46:24 48:3,18 48:22 49:7,10 49:21 53:8
**Down's** 10:12
**DPS** 16:14 18:15
**drafted** 43:22
**drag** 49:21
**due** 46:22,24
**duly** 1:16 5:3 60:16
**duty** 35:21

**E**

**earlier** 23:9 25:17 37:13 42:6 48:12 50:11 52:5 55:9,12
**east** 20:1
**Edmond** 21:14 22:12,15 28:15,17
**education** 6:17
**effecting** 47:2
**either** 7:3 38:11 52:1
**element** 41:10
**embellishing** 9:16
**employed** 5:17 61:8
**employees** 21:6 21:8 53:23
**Empty** 50:22
**EMS** 7:18,20
**encouraged** 7:9
**endeavor** 47:5
**ended** 18:6 57:16
**enforcement** 24:20 38:14
**entry** 9:11,17
**escort** 52:3
**escorted** 33:18
**especially** 35:21
**estimate** 29:2 39:22 56:6,15
**estimating** 56:5
**evading** 41:18
**evaluating** 20:14
**event** 44:16 50:12 53:3
**events** 44:22
**everybody** 23:7 51:14
**exactly** 22:6 30:20
**examination** 4:5 5:4 60:20
**example** 52:18 54:15 56:25
**Excellent** 6:14
**exchange** 21:1
**executed** 59:15
**exhibit** 4:10 34:10 42:25 43:9 44:2 45:9 45:19
**exhibits** 62:10
**exited** 21:13
**expected** 10:12 24:3
**Expiration** 61:18 62:18
**explain** 25:25 42:15 48:1,12 50:24
**explanation** 24:16,18 42:6
**expressed** 59:16
**extensive** 9:6
**extra** 7:11 9:15

**F**

**faces** 28:12
**facing** 27:14,14 27:15,16 28:4 28:9,10,16,17 28:18 31:12 31:22
**fact** 55:12,18
**factor** 46:25
**facts** 11:25
**Fair** 40:2
**fairly** 10:20 14:18
**fall** 30:22 38:23 51:23,24
**familiar** 43:14
**family** 6:13
**fan** 51:14
**far** 7:15,16,20 7:23 8:6 9:11 10:17,18 27:20 55:18 56:5
**fast** 11:11,17
**faster** 29:25
**Fax** 61:21 62:21
**fear** 25:4
**February** 7:3,4
**Federal** 1:22
**feel** 11:10 46:17 46:21 47:8
**feet** 29:2
**felt** 21:11,24
**fence** 16:21,23 16:23 22:24
**field** 41:3
**file** 11:1
**filed** 10:16 11:6 11:15 62:13
**financially** 61:10
**fine** 11:17 19:7 43:8
**finish** 18:11
**fire** 8:6,10
**firearm** 20:9
**firearms** 26:2
**firefighter** 7:19

**Firm** 61:19 62:19
**first** 5:3 12:18 12:25 13:18 22:1 30:16 43:2,6,25 44:1 44:4,7,10,15 44:16,18 45:17,17 46:7 48:17 49:5,5,6 49:16 55:22 56:13,18
**fit** 29:25
**five** 34:8 51:24
**fleeing** 41:14,18
**follow** 25:8
**following** 60:15 61:2
**follows** 5:3 60:23
**force** 4:13,14 8:25 9:1,2,13 34:15,20 35:2 35:8,9,13,14 35:25 38:14 38:16 45:11 45:19 46:9,10 46:18 47:1,7 47:17 51:21
**foregoing** 59:2 59:14
**form** 36:23
**forth** 54:24
**forward** 28:24 29:5
**found** 11:2
**founded** 10:25
**fourth** 43:5
**FRCP** 61:13 62:1
**front** 22:16 28:12 33:11 45:4 53:7 55:22 56:6
**full** 40:12
**further** 2:2 27:19,19 31:25,25 47:3 49:10 61:7,9 61:12 62:1

**G**

**gain** 47:19,22
**GARRETT** 3:11
**gas** 14:14
**getting** 33:6 41:7 49:19 53:12
**give** 13:7 18:25 24:2,16 32:8 52:18
**given** 29:12 31:15 32:1,7 59:17 60:18 61:1
**gives** 46:4
**giving** 48:12 55:1
**glad** 12:14
**go** 14:7 16:20 16:21 18:7 19:4 20:9,11 20:16 22:20 27:12 28:19 29:12 32:20 33:18 37:24 38:3 39:15 41:11,23 45:15 48:23 48:24 52:14
**goes** 7:20 26:16
**going** 11:11,16 15:14 17:8,17 19:5,20 20:13 20:15,16,17 20:18 21:12 26:14,18 27:3 30:2,3,8,10,11 34:10 37:24 38:22 41:11 41:23 42:25 44:3,8 45:4,9 54:7,9,22
**good** 10:13 30:10 40:3,23 42:4
**good-sized** 14:6
**grabbing** 32:24
**Gracie** 61:19 62:19
**graduate** 7:1
**Graduated** 6:21
**Granger** 8:10 8:12,16,17
**grappling** 37:11 37:15,16,18 52:4
**Great** 10:14 12:14
**greater** 46:9
**Greenhill** 1:21 2:6 3:7
**ground** 29:6,8 30:13,17,18 30:23 31:2 32:15,17 33:7 33:9 38:8,10 40:24 41:2
**grow** 22:23
**guess** 9:16 18:18 24:8 31:3
**gun** 20:6,9,19 21:20 26:10 26:12
**guy** 15:3
**G-R-A-N-G-...** 8:17

**H**

**Hackberry** 22:22
**half** 6:9
**Hall** 3:2,3 61:4 62:7
**hand** 50:22 51:25 59:17
**handcuff** 32:24
**handcuffed** 33:9
**handcuffing** 32:24
**handle** 16:8
**handled** 9:4 25:13
**hands** 28:20 38:11
**hands-on** 37:16
**happen** 23:18 38:25 48:9 49:15 50:2
**happened** 15:23 21:21 23:2 27:2 32:14 35:18 45:1 50:4 55:12
**happening** 20:13
**happens** 22:11
**hard** 25:23
**hat** 14:19
**hate** 18:4 22:6 36:8 45:20 50:17
**headed** 52:9
**headquarters** 7:24
**health** 9:19
**hear** 19:14 23:24 50:18
**heard** 13:9 15:21 17:11 17:12 19:19 29:3,4 53:17
**hearing** 32:11 32:12
**Heavy** 51:25
**help** 16:15 33:10
**helping** 5:20
**Henry** 1:3 3:10 5:11 11:25 13:19,24 14:3 14:5,16 16:14 16:15,18 17:20,25 18:15,22,22 18:24 19:1,3 21:23 22:8 23:4 24:3,24 25:18 27:2,5,8 27:9,11 28:3 36:3 39:18,24 40:21 41:7 42:7 47:10 48:3 52:13 53:24 54:21 60:3
**Henry's** 13:10 16:3,4 17:19 19:22 22:14 22:16 23:16 26:18 44:8
**hereto** 1:24 2:3
**he'll** 27:18,18 27:19
**hide** 16:21
**high** 14:15
**history** 41:14
**hit** 30:17,22 31:2 38:7 40:23
**hold** 6:24
**holding** 33:14 33:15
**home** 6:13 20:16 37:25
**Honestly** 12:7
**hood** 27:14
**hours** 6:23,24 60:24,25
**house** 13:10 16:20 22:7,14 26:13,16,18

27:12,20 28:9 28:12 32:10 48:6,15 54:17 54:21
**huge** 46:25
**hugs** 19:1
**hurt** 19:5 20:16 38:19

**I**

**idea** 25:9 34:2 56:1
**ignore** 27:17,18
**ignoring** 31:23
**immediately** 30:25 33:22
**impact** 31:1 33:22 36:15
**important** 25:12,14 33:7
**impression** 15:2 24:3,8
**incidences** 16:3 16:13
**incident** 4:12 12:3 15:15 24:5 43:10,12 50:9 54:20 55:10,22 57:8
**incidents** 12:11
**includes** 61:3
**Index** 4:1,4,10
**indicate** 36:2,18
**indicates** 37:10
**individual** 20:6 20:11 21:19 24:20 50:15
**individuals** 9:19 11:15 25:16
**information** 18:17 23:19 43:5 45:1 56:6 61:1
**informed** 13:6
13:16 14:3,4 21:22
**initially** 41:15
**injury** 37:20 39:9 41:17 47:6
**inside** 16:20 17:6,12 20:21 26:10,22 27:12 28:21 48:20
**instance** 1:15 48:2
**instances** 55:18
**instructed** 42:9
**instrument** 59:14
**intention** 26:13 32:9
**interacting** 9:18
**interaction** 13:18
**interactions** 18:15
**interested** 61:10
**intermediary** 7:6
**intermediate** 6:24 7:13 9:2
**interpretation** 36:4
**interrupt** 28:7
**intervene** 54:18
**intimidated** 16:5
**intimidating** 25:2
**investigations** 5:21
**involved** 23:23 32:23
**issue** 19:2
**issues** 14:21 17:2 51:17
**items** 52:22
**it'd** 51:24 52:16

**J**

**J** 3:10 5:11
**jail** 17:20 26:14
**JAMES** 1:3 60:3
**JEREMY** 3:11
**jewelry** 40:23
**joining** 6:5
**Joseph** 1:7 60:7 61:6
**Jr** 2:6 3:6 61:5
**judgment** 41:19
**Jurat** 4:7
**justify** 35:16

**K**

**keep** 20:2 27:18 27:19 36:10 36:13 54:18
**Keith** 3:2,3 4:5 5:5,10 8:19 18:14 34:16 37:10 39:5,15 39:17 60:24 61:4 62:7
**kid** 6:12
**kind** 8:19,24 18:20 30:2 41:2 42:14
**knees** 31:3 33:11
**knew** 23:9
**knocked** 17:10 22:7 40:24
**knocking** 48:3
**know** 6:10 14:10 15:12 16:1,10,12 17:17,24 20:12,13,16 23:3,7,14,21 24:18,25 25:8 25:14 26:4,10 26:11 27:4
29:23 31:5 38:15,19 40:22 41:12 44:25 48:4,8 50:14,16 54:11
**knowing** 27:7
**known** 30:1 59:12
**knows** 16:7 18:21
**Krav** 9:14

**L**

**La** 61:20 62:20
**large** 17:3 52:22
**law** 1:20 2:6 3:3 3:7 24:19 38:14
**leading** 11:25
**learn** 7:10
**learned** 9:1,14 14:17
**leave** 16:17 17:14 27:6
**leaving** 6:11 55:19
**led** 42:20
**left** 17:23 18:1,2 18:6,6 32:23 33:4,14,14 48:22 56:2,13 56:18,20
**legs** 31:4
**Leon** 1:18 3:13 60:14 61:18 62:18
**let's** 6:13 11:24 12:17 19:8 45:15,15 52:25
**level** 41:3
**Levels** 52:9
**license** 6:25 7:6 7:12,13
**life** 8:22
**lifted** 33:16
**likes** 18:21
**line** 22:24 58:4
**lines** 36:2
**list** 51:20 52:9
**little** 8:10 13:7 22:5 25:25 32:16 39:22 45:16 49:10 55:23
**live** 10:12
**location** 7:22
**locations** 18:4
**locks** 51:1
**long** 5:23 6:8 19:5 20:8 34:2 34:9
**look** 15:3 16:11 19:5 24:6 26:12 28:2 34:14 35:15 35:25 43:25 44:2 45:18
**looked** 29:4 40:4 55:21
**looking** 29:3 43:20 45:17 46:7 47:3,12 47:12,21 50:21 51:20 52:8 55:10 56:18
**looks** 29:2 43:14 46:5
**lose** 41:10
**lot** 11:8 25:7 44:25 51:17
**loud** 17:11
**Lubbock** 6:21 7:1 8:23

**M**

**Mace** 51:5,6,14
**mad** 27:18

**Maga** 9:14
**main** 7:24
**majority** 18:23
**man** 14:6 20:18 26:10
**mandated** 9:22
**maneuver** 30:8 30:19 37:18
**maneuvers** 38:3
**mangled** 38:9
**marked** 34:10 42:25
**master's** 7:13
**matching** 14:18
**ma'am** 5:9,13 6:15 7:7 8:8 9:20 11:20,23 12:4,16,24 13:3,20,23 14:1 15:18,22 18:9,16 19:13 19:16 21:9,16 22:19 23:11 24:15 26:25 28:8 29:9,14 29:20 30:21 30:24 31:13 32:3 34:17,21 34:25 36:17 37:12,14 40:6 40:8,13 42:4 43:11,17,24 44:6,12,14,17 44:20,23 45:8 45:14 46:6,13 46:15,19 47:11 48:10 49:2,14 51:12 51:22 52:11 53:6 54:14 56:21,24 57:5 57:9,11
**mean** 14:21 15:4,9 24:7,19 25:11 32:19 36:8 37:6 38:18 41:14 47:16 51:4 52:2,16 55:9 56:5
**means** 38:22 46:1
**medical** 19:1 51:16
**medications** 14:7
**meds** 14:20
**mental** 9:19 10:8 14:21 15:11 19:1
**mention** 44:7
**mentioned** 18:14
**met** 21:14 29:23 50:13
**middle** 28:3
**Mike** 2:6 3:6 61:5
**miles** 8:13
**mind** 10:10 24:9 30:8 42:21
**minimal** 38:16 47:1
**minimize** 47:5
**minutes** 34:9 60:24,25
**misconduct** 10:15
**missing** 44:25 45:2
**money** 7:11
**month** 10:7
**Morehouse** 1:7 1:11,15 2:4,5 4:5 5:2,7,8,15 39:17 58:2 59:2,6,12 60:7 60:12,16 61:5
**morning** 55:13 55:16
**move** 19:8 29:4 31:5 38:11
**movements** 27:10
**mthompson...** 3:9
**music** 17:11,16

**N**

**name** 5:6,10 12:25 58:2 59:14
**narcotics** 5:20 9:5
**narrative** 43:4 43:19
**nationwide** 47:18
**nature** 11:5 50:19
**necessary** 46:10 46:18
**need** 23:7 25:11 26:8 30:8 48:4 48:5
**needed** 8:4 15:13 24:14 24:18 37:17 38:12 47:1
**neither** 61:7
**nervous** 57:2
**never** 10:24 25:5
**normal** 42:21
**normally** 43:6
**north** 8:13,20 16:22,22,23 16:24 27:14 28:4,10,15,17
**notary** 2:9 59:23
**note** 45:23
**noted** 59:4
**nothing's** 11:1
**number** 47:13 47:23 50:21 51:3,24 52:3,7
**numbered** 1:17
**numbers** 45:24

**O**

**oath** 59:13
**objection** 36:23 37:5
**observed** 35:17
**obtaining** 2:8
**obvious** 15:9
**obviously** 33:9 40:11 42:17 54:11
**OC** 51:5
**occasion** 19:15
**occasions** 24:21 45:4
**occupation** 5:14
**occur** 25:19 26:24
**occurred** 12:18 25:15 48:16 61:13
**occurrence** 48:17
**offenses** 11:9
**office** 59:17
**officer** 6:4,18 6:21 7:12 10:18,21 12:22,23,25 29:15 35:12 35:12 36:3,19 47:5,13,18 60:17 61:2 62:3
**officers** 7:9 13:14 16:4,9 18:23 19:5 29:10 36:9 42:10
**officer's** 35:21 40:17 62:8
**offices** 1:21 2:6 3:3,7
**oh** 8:3 15:3 32:18 45:17 53:18
**okay** 5:10,14,23 6:20 8:6,14,18 8:24 9:10 11:18,21 12:5 12:8,17,19,25 13:4,9,21,24 15:14,16,23 18:1,8,14 19:8 19:10,14,24 20:25 22:2,10 22:20 23:1,21 24:1,13,16 25:23,24 26:3 26:11,21 27:1 27:23 28:7,12 28:14,16,19 28:19,22 29:12 30:5,22 30:25 31:10 32:4,14,18 33:17 34:2,24 35:1 36:16 37:3 39:4,7,14 39:24 40:9,11 41:4 43:7,12 44:6 45:9,9,13 45:15,25 46:3 46:7 48:9,25 49:3,6,15 50:6 50:7,18 51:3 52:8,8,15,18 52:25 53:1,18 54:15 55:6,10 55:21 56:1,4,8 56:11,15,20 56:22,25
**OLTORF** 3:3
**once** 38:10,10 41:21 49:3

**ones** 21:25
**open** 38:21 48:23
**opportunity** 12:2
**option** 41:8 42:2 51:9
**oral** 1:10,14 60:17
**order** 29:12,19 43:7 55:16
**original** 2:3 22:1 62:2,6,9
**originally** 49:16 49:17 50:20 55:24 56:2
**outcome** 61:11
**outside** 9:4 10:1 16:18,25 22:8 26:16 27:11 34:3 35:17 54:22
**out-sprinted** 39:18
**overall** 26:23
**overgrown** 22:23
**owners** 26:9
**O'Rourke** 61:19 62:19

**P**

**page** 4:1,6,11 43:2,3,4,5,5,6 44:1 45:17,24 46:7 47:3,12 50:21 52:8 58:4 62:4
**pain** 47:6 51:1
**pants** 14:18
**paragraph** 43:25 44:4,7 44:10,15 46:8 46:8
**parked** 18:3 22:13,17
**part** 19:9 22:9 43:22 45:3 47:4,8 50:8,9 54:13
**partially** 48:22
**particular** 23:22
**parties** 2:3 61:3 61:8 62:13
**party** 60:22
**pass** 57:13
**passed** 56:12
**patrol** 6:4 10:5 31:12,19 53:5 57:4
**pay** 7:11
**PD** 18:20 23:17 24:10
**peace** 7:12
**people** 10:21 11:7,8 13:12 14:5 18:20 23:6 24:23 25:2,6,9 33:8 47:22 51:15 53:17
**percent** 45:20 47:19
**person** 21:3 35:1,9,17 38:21,23 39:9 59:13
**personal** 41:13
**personally** 51:18 59:12
**Phone** 61:21 62:21
**pick** 24:10
**picked** 33:24
**pistol** 26:4
**pit** 17:4
**place** 22:1 26:22 44:16 54:10 55:23
**plaintiff** 1:4,16 3:2 5:11 60:4 61:4 62:9
**plan** 27:21 29:22
**playing** 41:3
**please** 39:15 43:1 47:4
**Plus** 49:21
**point** 17:14 18:1 21:15 25:2 27:6 31:7 31:11,14,18 34:8 35:13 40:11,22 41:11 49:4 54:12,23
**points** 51:20
**police** 5:18 6:6 6:7,18,21,21 7:2 9:16 10:18 10:19,21 32:12 45:11 47:21 49:24
**policy** 4:13 45:12,19 46:5 46:12 47:9 50:21
**porch** 16:19,24 17:9
**position** 5:24 6:3,17 7:17 10:6 30:10 41:10
**possibility** 42:4
**possible** 36:6 37:23
**possibly** 15:10 47:6
**preaching** 17:12
**preparing** 62:9
**presence** 9:16 47:14,19
**present** 3:10 12:15 20:25 21:5 41:5 45:6
**pretty** 14:10 47:18
**prevent** 37:20 39:9
**previous** 16:3 16:13 24:21
**prior** 6:3 13:25 32:2 49:18 50:4 53:12
**probably** 17:1 51:7,24 52:7 56:18
**problems** 51:15
**procedure** 1:23 34:24 35:7 37:21
**proceeding** 61:9
**Proceedings** 5:1 57:16
**process** 19:18
**produced** 1:15
**property** 19:21 19:23
**protect** 24:24 26:11,13 27:9 41:2 47:1
**proved** 59:12
**provided** 46:2
**provisions** 1:23
**public** 2:9 59:23
**pull** 28:6,23
**pulled** 19:25 26:12
**pulling** 21:12 23:6 24:23 33:2
**punches** 50:25
**purpose** 2:8
**purposes** 59:16
**pursuant** 1:22 61:1,12
**push** 33:12
**put** 20:6,9,19,19 20:21 36:7 37:8 52:7
**putting** 25:3 41:9
**P.C** 2:7 3:7
**p.m** 1:18,18 5:1 39:16 57:16

**Q**

**question** 10:20 12:10 18:12 35:4,5 36:24 37:2 39:3 40:2 40:3 44:3 54:6 55:16
**questions** 57:12 57:15
**quick** 28:7 53:12
**quite** 9:6

**R**

**R** 5:11
**radio** 13:9 15:17
**Ranger** 8:15
**read** 24:21 37:6 43:14 47:4 59:2
**real** 28:7 33:25 53:11
**realizing** 17:7
**really** 15:5 20:8 24:7,18 56:11
**reason** 6:11,11 6:14 42:19 58:4
**reasonable** 42:21
**reasoning** 42:19
**reasons** 62:5
**reassurance** 46:4
**recall** 12:8 19:11 20:8
**receiving** 11:10

**Recess** 39:16
**record** 1:23 2:5 5:6 37:4 39:15 60:18 61:3
**referred** 51:5
**reflect** 44:21
**refrigerator** 52:21
**regarding** 8:25 12:3 18:10
**Registration** 61:19 62:19
**regular** 5:21 6:22
**related** 61:8
**relatives** 10:8 10:10
**relevant** 7:16
**religious** 17:13
**remember** 22:4 22:6,9 32:11 32:12,13 33:23 48:11 50:11 55:5
**rephrase** 55:15
**report** 4:12,14 18:8 34:15,18 34:20 35:3,8 35:10,14,25 36:5,18 37:10 43:3,9,18,23 43:23 44:1 53:16 55:21 56:9,12
**reported** 1:19
**reportedly** 54:8
**Reporter** 1:19 3:13 60:14
**Reporters** 61:19 62:19
**Reporter's** 4:7 60:11
**reports** 12:3 24:22
**required** 9:23
**requirements** 61:12
**reserve** 57:14
**residence** 19:22 53:13
**resist** 47:22
**resistance** 52:10 52:16 54:16 55:7,14 57:1
**resisting** 33:1 41:14,17
**resolution** 56:23
**respective** 2:3
**respects** 18:22
**result** 47:6
**return** 60:21
**returned** 62:2,4 62:6
**Reverend** 3:10 5:11 11:25 13:10,18,24 14:3,5,15 16:3 18:15,21,22 22:16 24:3,14 25:18 26:17 27:2,5,8,11 30:22 31:15 33:21 34:4 36:3,21 39:18 39:24 41:6,24 42:7 44:8 47:9 48:3 52:13 53:24 54:20
**review** 12:2
**riding** 14:13,15
**rifle** 20:6,7 26:5
**right** 5:22 15:10 16:20 17:6 20:14 21:10 23:10,13 28:1 30:16 31:8,8 32:14,21,22 33:15,16 38:7 48:20 50:20 52:25 53:22 53:25 54:2,22 55:20 56:3,14
**River** 8:10
**road** 28:3 53:21
**roadway** 52:21 53:13 54:5
**ROBERT** 1:3 3:10 60:3
**Rockdale** 8:2
**Rogers** 8:2
**role** 9:5 10:18
**rude** 11:7 36:9
**Rule** 61:12 62:1 62:12
**Rules** 1:22
**run** 28:1,2 31:16 36:7 38:5
**running** 30:13 32:2,5 38:4 40:12 48:6,15 54:17,21,24
**runs** 28:15

**S**

**safety** 23:7
**safety-wise** 40:17
**San** 61:20 62:20
**saw** 14:13,23 15:2 20:4 27:3 29:4 40:4 53:14
**saying** 9:17 10:10 11:4 13:10,11 32:12 35:6 37:7 42:17 48:11 50:3
**says** 20:15,19 27:25 45:24 46:11 47:13 47:23 50:22 51:3
**scared** 14:5,9 25:10
**scary** 25:7
**scenario** 39:19
**scene** 12:6 13:5 18:2 20:14 44:19 49:21
**school** 11:12
**Scott** 7:21,23
**screaming** 14:8
**seal** 59:17
**seat** 11:11 57:3
**second** 6:12 19:8 39:11,19 41:20 43:3 44:2 46:8 50:8 50:12 53:3 54:20 56:8,9 56:13
**Section** 47:4,13 52:8
**secure** 29:13 31:9 33:5 34:3
**secured** 21:11
**see** 5:12 7:14 8:3 16:1,24 27:4 28:2 29:24 35:11 35:11,23 36:8 36:12 42:16 44:7 45:18 49:9,9 52:9 53:15,20 54:13
**seeing** 13:22
**seen** 18:25 19:2 34:16 45:13
**sense** 35:9,22
**sent** 2:4
**separate** 55:17
**September** 12:1 60:21
**sergeant** 12:21 14:4,14,25 15:8,24 16:6 16:13,14 17:16,18,25 18:19,21,25 19:2 20:5,19 20:22 21:14 21:18 22:6,12 23:1,15,20 24:2,13 25:11 27:7,13,15,16 27:23 29:17 29:19,23 32:22,25 33:4 34:19 36:12 41:5 42:6,18 43:21 45:6 48:23 50:1,13
**serve** 13:17
**served** 62:12
**Service** 11:19
**set** 22:21 33:10
**seven** 10:12 51:20
**shape** 29:25
**sheet** 43:6
**shirts** 13:12 14:19
**shoes** 14:19
**shop** 19:21 20:1 20:3,4,22 21:13,24 22:14 24:22 24:23 26:9 53:17 54:7
**short** 8:22
**Shorthand** 1:19 3:13 60:14
**shortly** 36:8
**shorts** 28:4,24 40:1,5,9
**shotgun** 20:7 26:5
**show** 17:22 19:4 34:10 40:20 42:25 45:9
**showed** 17:24

22:5 33:25
**showing** 14:21 52:23 54:9 55:7
**shown** 62:13
**shy** 5:22
**side** 13:15 16:22 16:22 20:1 21:13 28:5 31:8 32:22,23 33:14,15
**sidewalk** 14:24
**sign** 14:20
**signature** 2:8 4:6 36:1 58:1 59:1,3 60:20 62:4
**sir** 50:1
**sit** 27:3,17 37:6
**sitting** 5:12 27:13,22 31:12,19 32:3 34:6 53:4,5 57:2
**situation** 10:6 15:11 16:9,16 20:20 30:14 38:5,17
**situations** 9:5 25:6,10 51:16
**size** 14:6 30:9 30:10 46:24
**slash** 37:11
**sneak** 32:9 34:3
**somebody** 11:16 35:13
**someone's** 41:11
**somewhat** 42:5
**soon** 29:24 31:2 31:2
**sorry** 18:13 29:15 32:20 36:25 40:2 43:7 44:13
50:6
**south** 19:22 22:14 27:15 28:15
**special** 9:7 37:19
**specifically** 24:11
**speculate** 18:4
**speed** 40:12
**split** 41:20
**spoke** 52:4
**spray** 51:5
**sprint** 36:10
**sprinted** 36:11 39:20
**sprinting** 36:3
**stand** 33:13
**standard** 34:24 35:7
**standing** 16:22 28:3 30:9 37:17
**standpoint** 35:22
**stars** 13:12
**start** 6:20 12:17
**started** 32:4 49:21
**starting** 31:11 31:14,16,18
**starts** 14:8,20 31:6
**state** 1:19 5:6 9:23 46:8 59:9 59:24 60:15
**stated** 1:23
**statement** 25:17
**STATES** 1:1 60:1
**stations** 7:25
**stature** 14:6
**stenographic** 1:20
**stepped** 16:15
22:8
**stepping** 16:19
**steps** 22:2
**stick** 54:8
**stipulated** 2:2
**Stipulations** 2:1 4:2
**stomping** 17:11
**stood** 22:4
**stop** 11:8 48:7,7 48:13,21,21 48:25 49:1 50:10 52:25 54:18 55:2
**stops** 10:23
**street** 1:21 2:7 3:3,7 21:14 22:13,15 28:15,16,18 53:10
**streets** 13:22
**stuff** 14:8 16:19 20:2 27:12 51:8,16
**subjected** 11:21
**submitted** 60:19
**subscribed** 59:14
**substantiated** 10:25 11:1
**suggesting** 41:4
**Suite** 1:22 2:7 3:7
**sunglasses** 33:24,25
**supervisor** 34:23 35:7,20 35:22
**supervisors** 35:21
**supplement** 43:2,19,20,21
**Supplementary** 44:1
**supposed** 23:22 24:12
**sure** 6:10 12:15 13:8 18:3 22:9 23:23 31:4 34:14 37:22 39:13 43:15 43:16 45:22 45:23 50:17 53:14 54:19
**surely** 27:5
**surprise** 41:10
**Suspect** 43:4
**SWAT** 9:4,7,15 9:15
**swinging** 14:24 15:4 19:3 54:8
**sworn** 1:16 5:3 60:16
**Syndrome** 10:12

T

**tackling** 36:3,21
**tactic** 46:17
**tactics** 9:13,14
**take** 7:10 9:23 13:13 16:1,12 16:17 17:1 18:7 20:20 22:2 23:25 24:6,10 25:18 25:19,22 27:2 27:21 37:17 38:23 39:9,11 40:14 41:12 41:20 45:15 46:23 55:23
**takedown** 30:8 37:11,15,20 46:16 47:9 51:23
**taken** 1:16 6:23 17:20 23:12 24:14 61:2,9
**takes** 26:17 31:8
**talk** 11:24 27:17
**talking** 26:4,5 27:22 33:23 34:5 39:19 43:13,15
**taught** 39:8
**Taylor** 1:6 5:18 6:5 8:13 45:11 49:24 60:6 61:5
**TCLEOSE** 9:3
**team** 10:2,4
**Tech** 6:7
**technique** 37:19 38:20
**techniques** 39:8 51:25 52:3
**tell** 6:16 11:7 12:5 15:10 25:12 34:11 34:22 43:1 45:10 48:15 49:22 50:10 56:11
**telling** 48:3,7 49:18 54:18
**tells** 27:23,25
**Temple** 7:23 8:1 8:2
**Terroristic** 19:20
**Terry** 1:6 60:6 61:5
**Terry's** 19:21 20:1 21:23 22:13 24:22 24:23 53:17 53:23 54:7
**testified** 5:3 41:6
**testimony** 60:18 61:2
**Texas** 1:1,19,22

2:7 3:4,8 6:7 8:20,20 26:1 60:1,15 61:18 61:20 62:18 62:20
**Thank** 28:19 57:15
**therefor** 62:5
**thereon** 2:9
**thing** 18:20 33:23 40:25 41:1
**things** 25:7 41:19 42:18 51:1,2 52:20 52:21 53:7,12 53:20
**think** 15:5 25:3 40:17 46:20 51:10,21 55:13,22 57:3
**third** 28:18 43:4
**Thompson** 2:6 3:6 8:15,18 18:11 34:12 34:14 36:23 37:1,4 39:2 57:14 60:25 61:5
**thought** 11:16
**thoughts** 37:8
**threat** 19:20 21:21
**threaten** 20:17
**threatened** 21:23
**threats** 25:9
**three** 31:11
**threw** 54:1
**throwing** 52:20 52:22 53:7,15 54:3,4
**thrown** 53:13
**thumbs** 28:5,21
**time** 12:5 17:25 19:11 20:24 21:7 23:22 24:1 27:4 29:5 31:10 32:1,1,4 33:1,21 38:13 38:14 42:17 44:18 45:1,6 45:15 49:5,6 49:11,21 51:7 53:2,4 54:25 55:1 56:1,8,9 56:12,12,13 56:13,16,17 56:18,20,23 57:2,7,15 60:22 61:2
**times** 10:6 11:8 14:7 38:4,19
**today** 20:16 43:13
**toe-to-toe** 30:9 37:17 40:21 41:12,23
**told** 14:17,25 15:25 16:11 16:17,21,24 17:16 21:18 21:22 50:12
**totality** 41:20
**totally** 26:19 55:17
**town** 13:15
**traffic** 10:22 11:8
**trained** 18:23 30:7,12 33:8 37:24 38:2 42:9
**training** 6:16,22 6:24 7:14 8:24 9:3,6,7,11,15 9:18,22,23,24 39:8 46:14
**transcript** 60:17,19 62:10
**transcription** 1:20
**trapped** 38:11
**trees** 22:22,23
**tremendous** 51:15
**trial** 57:15
**tried** 17:10 42:18,19
**truck** 8:5
**true** 11:2 14:18 14:22 59:3 60:18
**try** 15:25 16:25 17:5 31:9 35:5 37:20 39:8 40:21 45:3 49:22
**trying** 13:12,17 29:11 30:2 36:6 38:23 39:9 42:18 44:8 45:5 48:18,19 54:18,23
**turn** 23:17,22 24:12 28:1
**turned** 17:11,15 24:4 27:24
**turning** 55:19
**twice** 10:7 17:7
**two** 6:9 9:24 12:11 35:21 36:2 45:4 47:23 55:17
**type** 9:5,12 22:22 38:14 47:6

**U**

**Uh-huh** 31:21 31:24 32:6 42:8,11,13 47:15,25 50:23
**ultimately** 22:11
**underneath** 33:2
**understand** 25:1,23 36:13 37:24 50:6 54:19
**understanding** 17:18,23 46:12 49:20 50:4 56:22
**understood** 31:19
**underwear** 28:5 28:6,21,23
**unfortunately** 38:13,18 41:18 42:23
**uniform** 47:20
**uninjured** 37:25
**unit** 5:19
**UNITED** 1:1 60:1
**unknown** 29:2
**upset** 11:9 34:1
**use** 4:13,14 8:25 9:1,2,13,13 34:15,20 35:7 35:13,14,25 37:19 38:14 45:11,19 46:8 46:16 47:7,17 51:8,19 52:1
**usually** 14:19 16:8 47:19,21

**V**

**vehicle** 22:12,17 33:20
**verbal** 31:14 32:1,7,8 47:23 48:8
**Verita** 61:20 62:20
**versus** 30:9
**viable** 41:8
**video** 57:4,10
**Videographer** 3:12
**VIDEOTAPED** 1:10,14
**view** 22:15,25 35:13
**viewing** 55:10
**violence** 26:23
**visit** 17:19
**visited** 23:15
**visiting** 21:19 21:20 23:3 24:2
**volunteer** 7:19 8:6
**VS** 1:5 60:5

**W**

**wait** 27:4,20
**waiting** 34:3
**walk** 13:22
**walked** 26:12
**walking** 14:24
**want** 12:12 32:9 55:8
**wanted** 35:16 36:6
**warrant** 11:16 49:12
**warrants** 13:17 23:4,9 41:15 48:4,7 49:23 50:10
**wasn't** 10:12 12:14 15:11 15:13,20 17:7 21:12 23:12 23:23 26:20 30:10 33:19 34:9 49:20

51:7 54:23 55:3
**was/was** 62:2
**way** 9:17 10:22 11:4,15 17:11 22:21 30:7,11 30:12,15,17 33:6,8 36:10 37:23,25 38:2 41:25 42:14 53:10 55:7,11
**weapon** 20:11 21:3,11 26:17
**weapons** 23:6 24:23 25:16 25:19 50:25 51:4
**wearing** 13:12 14:16,18
**wears** 40:23
**weeks** 11:14
**weigh** 38:16
**weight** 38:22
**went** 17:9 20:21 22:7 49:8
**weren't** 54:23 54:24 55:18
**west** 1:21 2:7 3:3,7 21:13 22:13 27:16 28:13
**WESTERN** 1:1 60:1
**we'll** 6:20 16:12 20:20 27:17 27:20 57:14
**we're** 5:21,21 9:23 26:4,5 27:22 32:2 34:5 38:4 41:2 41:9 43:12,15 47:21 48:2,7 53:3 56:18
**we've** 23:3,5,5 24:6 38:15,15
46:22
**White** 7:21,23
**Who-all** 20:25
**wide** 38:22
**wife** 6:12
**Williamson** 10:2
**willing** 56:15
**witness** 1:15 2:8 4:6 8:17 18:13 36:25 37:3 39:4 57:13 58:2 60:16,18 60:20
**work** 5:19 6:5 7:20,25 10:1,3 17:8 38:1 41:6 42:7
**worked** 7:18
**working** 21:6
**worry** 14:25
**worrying** 15:12
**worth** 6:23
**worthy** 11:10
**wouldn't** 24:7 33:3 35:8 41:7 52:3
**wrap** 38:5
**wrapped** 30:16
**wrapping** 38:21
**Wright** 1:21 2:6 3:7
**wrist** 51:1
**write** 18:8 35:14
**writing** 35:2
**wrote** 35:15

**Y**

**yard** 17:3 20:2 54:5
**yards** 36:7 39:20,21
**yeah** 9:22 14:1 15:7,9 16:23 17:15 18:13 26:10 34:13 36:20,22 42:16 48:14 53:19
**year** 6:9
**years** 6:9 9:24
**yell** 49:3
**yelled** 48:23
**yelling** 14:8 16:19 19:4 27:11 48:25
**younger** 8:11
**You-all** 15:25 16:1

**Z**

**zone** 11:12

**0**

**0** 60:25
**02B** 47:4
**03** 47:13
**04** 52:8
**08** 57:7

**1**

**1** 4:12 43:1 47:13 60:24 60:25
**1:10-CV-0069...** 1:5 60:5
**1:33** 1:18 5:1
**10** 29:2 34:8
**10:00** 55:23
**10:45** 56:19
**100** 45:20
**11** 8:13
**11:15** 56:19
**11:53** 56:10
**12/31/12** 61:18 62:18
**1800** 1:22 2:7 3:7
**19015** 61:20 62:20

**2**

**2** 4:2,13 45:10 47:12
**2,400** 6:23
**2:13** 39:16
**2:16** 39:16
**2:40** 1:18 57:16
**2006** 7:3,4 24:20
**2008** 12:1
**2009** 6:2
**2011** 1:12,17 58:3 59:18 60:12,20,21 61:15 62:15
**21-year-old** 10:11
**210** 61:21,21 62:21,21
**22nd** 12:1
**221** 1:21 2:7 3:7

**3**

**3** 4:3,14 34:11 50:21,21
**3C** 52:3
**3rd** 7:3
**30** 61:13 62:1 62:12
**34** 4:14

**4**

**4** 4:4 51:3 52:8 60:24
**40** 36:7 39:20 39:20
**42** 4:12
**426** 61:19 62:19
**45** 4:13
**476-4600** 3:8
**479-6161** 61:21 62:21
**479-6162** 61:21 62:21

**5**

**5** 4:5 52:7
**512** 3:4,8
**59** 4:6

**6**

**6th** 1:21 2:7 3:7 7:4
**605** 3:3
**61** 4:7

**7**

**743-6064** 3:4
**7716** 61:18 62:18
**78258** 61:20 62:20
**78701** 1:22 2:7 3:8
**78704** 3:4

**9**

**9** 1:12 58:3 60:12
**9th** 1:17
**90** 47:19
**911** 13:11 49:17